**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ROWENA TACHIAS and
MONIQUE DERETA,

      Plaintiffs,

v.                                    Civ. No. 1:21-cv-00085 MIS/JFR

LOS LUNAS SCHOOLS BOARD OF
EDUCATION, BRYAN SMITH, in his
individual capacity and in his official capacity
as President of the Los Lunas Schools Board
of Education, ELOY GIRON, in his official
capacity as Vice President of the Los Lunas
Schools Board of Education, STEVEN
OTERO, in his official capacity as Secretary
of the Los Lunas Schools Board of Education,
FRANK OTERO, in his individual and
official capacity as a member of the Los
Lunas Schools Board of Education,
P. DAVID VICKERS, in his official capacity
as a member of the Board of Education, and
DANA SANDERS, in her individual capacity,

      Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT DANA SANDER'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

THIS MATTER is before the Court on Defendant Dana Sanders' ("Defendant")
Motion for Summary Judgment on Basis of Qualified Immunity ("Motion"). ECF No. 24.
Plaintiffs Rowena Tachias and Monique Dereta (collectively, "Plaintiffs") filed their
Response, and Defendant filed her Reply. ECF Nos. 34, 43. Having considered the
parties' submissions, the record, and the relevant law, the Court will deny the Motion.

## FACTUAL BACKGROUND[1]

This case centers around a dispute between two parents (Plaintiffs), the Los Lunas School District ("District"), and its Superintendent (Defendant) over a Facebook page titled the "Los Lunas School District Parent Discussion Page." The facts below are undisputed and stated in the light most favorable to Plaintiffs for purposes of the present Motion.[2]

### I.     Creation of the Los Lunas School District Parent Discussion Page

Plaintiffs are residents of Valencia County, New Mexico, and have children and grandchildren who attended public schools in Los Lunas, New Mexico. ECF No. 24 at 2, ¶ 1. In February 2011, Plaintiffs created a Facebook page titled the "Los Lunas School District Parent Discussion Page" and became the page administrators. *Id.* at 3, ¶ 3. By the fall of 2011, the Los Lunas School District Parent Discussion Page had amassed approximately 180 members. *Id.* at 3, ¶ 6. Plaintiffs currently limit the invitation process of the page to "administrator approval only." *Id.* at 3, ¶ 5. The page's content is primarily user-generated, with posts consisting of commentary made by its members. *Id.* at 3, ¶ 7.

### II.    Defendant's Concerns Regarding the Los Lunas School District Parent Discussion Page

The Los Lunas Schools Board of Education ("Board") is the duly elected board of education for the District and oversees several schools—including Valencia Middle School and Valencia High School. *See* ECF No. 1 at 4, ¶ 11; 5, ¶ 20; 9, ¶ 31. Defendant

---

[1] For the ease of reading the Court omits any reference to [sic].

[2] Per Local Rule 56.1(b), all material facts set forth in the motion for summary judgment and response will be deemed undisputed, unless specifically controverted. D.N.M.LR-Civ. 56.1(b).

was employed as the Superintendent of Schools for the District from 2014 to August 2020. ECF No. 24 at 3, ¶ 2.

Around the summer of 2018, Defendant started to have concerns regarding the Los Lunas School District Parent Discussion Page. During this period, Defendant conducted an internet search that showed Plaintiffs' page as one of the first pages appearing in a Google search for "Los Lunas Schools." *Id.* at 3, ¶ 8. Defendant then came to believe the page and use of the term "Los Lunas Schools" were confusing and misleading to persons searching for information regarding the District and its operations and had at times been mistaken for a forum monitored and approved by District administrators. *Id.* at 4, ¶ 9. Further, during Defendant's tenure as Superintendent, parents and community members complained about Plaintiffs' page. *Id.* at 4, ¶ 10. Numerous phone calls were made to the District's central office relaying confusion caused by Plaintiffs' page and the erroneous impression held by some callers that the page was the official site for information on the District. *Id.* at 4, ¶ 10. At the same time, Defendant was aware that at least some individuals understood the page to be a "parent group Facebook page," not an official page sponsored by the District. *See* ECF No. 24-11 at 1.

One category of confusion caused by the page related to "snow days," where posts on the page provided incorrect information on whether such days involved school closure(s) or a delay in start time. ECF No. 24 at 4, ¶ 11. Another example related to the school calendar for the District, where an "old" copy of the 2019–2020 calendar was posted to the page. *Id.* at 4–5, ¶ 13.

Also, Defendant had additional concerns about postings that allegedly identified minor children. *Id.* at 5, ¶ 14. While some of these postings involved parents identifying

their own children, Defendant expressed concern as a professional educator that these parents had done so without knowledge or information of their rights under the Family Educational Rights and Privacy Act ("FERPA").[3] *Id.* at 5, ¶ 14.

The page also included postings about District employees, stating criticisms or concerns regarding specifically named employees and inviting comments from other participants. *Id.* at 5, ¶ 15. District staff complained about these postings to their building administrators, who brought the matters to Defendant's attention. *Id.* at 5, ¶ 15. Defendant believed these posts would be especially concerning as they could subject District employees to termination by the Board. *Id.* at 5–6, ¶ 16.

### III.   Report of District Principal Allegedly Threatening Student

On October 12, 2018, a community member posted on the Los Lunas School District Parent Discussion Page alleging that Jason Baca,[4] principal of Valencia Middle School, threatened a student with physical violence and told the student to keep quiet about it. *Id.* at 6, ¶ 17. The post stated:

> Valencia Middle School Football parents! Please ask your children what Mr. Baca told them today for lunch! This principle threatened to bring his son who goes to LLMS to fight #77 on the Valencia middle school team. He even wrote up this poor kid for exchanging words with his son, well playing in a football game last night. Its football yes kids should not be talking crap but for this principle to tell this kid anything was uncalled for.the Principle even told he was a bad football player. Wth is wrong with this Mr Baca!

---

[3] FERPA is a federal statute that protects the privacy of student education records. *See* 20 U.S.C. § 1232g(b)(1). However, FERPA only applies to educational agencies or institutions that receive funds under an applicable program of the United States Department of Education—not parents or other individuals. *See id.* Defendant has not identified a specific provision of or right under FERPA that would be implicated by a parent identifying their own child in a social media posting.

[4] Jason Baca is the brother of the District Deputy Superintendent, Brian Baca, and the District Chief Financial Officer, Claire Cieremans, both of whom worked side-by-side with Defendant in the District central office. ECF No. 34 at 6, ¶ B.

ECF No. 34-1 at 2. This post received over 100 comments. *Id.* at 2–10. Moreover, the story was reported on by news media. ECF No. 1 at 10, ¶ 34. On October 18, 2018, in response to media attention, the District issued an official statement asserting that the Los Lunas School Parent Discussion Page was "a social media account created by 'disgruntled parents.'" ECF No. 34 at 6, ¶ C. The parents of the student who was allegedly threatened contacted the District several days after the incident. ECF No. 24 at 6, ¶ 19. The District's Director of Personnel was assigned to investigate the underlying incident but concluded the post had compromised the investigation. *Id.* at 6, ¶ 20.

## IV.    Defendant's Communications Following the Alleged Incident

Following the alleged incident at Valencia Middle School, Defendant, in her capacity as Superintendent of Schools, began to actively work towards obtaining a trademark for "Los Lunas Schools." *Id.* at 7, ¶ 22.

On October 15, 2018—three days after the alleged incident—Defendant sent a group text message to the Board members. *Id.* at 7, ¶ 23. Defendant's message stated:

> This one is totally out of control. I have contacted Andy Sanchez he is looking into some things. I am looking at trying to figure out how to Trademark the Los Lunas Schools name. I want that removed from their FaceBook page.

ECF No. 24-2 at 1. Andy Sanchez is an attorney who performs legal work for the District. *See* ECF No. 24 at 7, ¶ 23. Board member Brandon Campanella responded: "That is a great idea." ECF No. 24-2 at 1.

Additionally, as part of Defendant's communications as Superintendent of Schools, Defendant sent regular "Board Updates" to the Board on various topics and issues concerning the management and administration of the District. ECF No. 24 at 7, ¶ 21. For

example, on October 19, 2018, Defendant sent a Board Update for the week of October

15–19, 2018. *Id.* at 7, ¶ 24. It stated:

> I am sure that some of you have followed at least some of
> what is showing up on the Los Lunas Schools parent
> discussion page, or as many have labeled it [THE HATERS
> PAGE]. At this point, it is unfortunate but we will never be able
> to get to the bottom of what actually happened. No one,
> including the parent, contacted the school or Central Office
> until Sunday at 10:00 pm, and that was in an email. The
> incident occurred on Thursday and went crazy on the
> Facebook Page on Friday and during the weekend.
>
> During the week, the parent and others have continued with
> protest gear[,] all-calls for action and so forth. It will be virtually
> impossible to gather any information that has not been
> severely compromised by the comments and description of
> the incident from the parent's second hand information and
> the comments of others. In addition, statements were being
> made on the page about a protest at last night's middle school
> football game between Los Lunas and Valencia Middle
> School, and possibly the board meeting.

ECF No. 24-3 at 1.

## V.    Application for and Issuance of Trademark

On October 22, 2018, Defendant filed, on behalf of the District, a trademark

application for "Los Lunas Schools." ECF No. 24 at 8, ¶ 25. The "Identification" for the

trademark application listed that the mark would be trademarked for: "Education services,

namely, providing pre-kindergarten through 12th grade (pre-K-12) classroom instruction."

ECF No. 1-2 at 23. On July 9, 2019, the United States Patent and Trademark Office

registered the trademark of "Los Lunas Schools," with the District being the owner of said

trademark. ECF No. 24 at 8, ¶ 26.

6

**VI.     Defendant's Mailing of Cease-and-Desist Letters to Plaintiffs**

On August 2, 2019, Defendant sent another Board Update for the week of July 29–

August 2, 2019. *Id.* at 8, ¶¶ 27–28. The update stated:

> Since we have been issued a Trademark for Los Lunas
> Schools, I have asked Jacque Archuleta Staehlin to write a
> cease and desist letter to the owner of the Los Lunas School
> Parent Discussion Page. I expect that this will cause
> somewhat of a disturbance on that page. If you have
> objections to me sending the letter, please let me know as
> soon as possible.

ECF No. 24-5 at 1. Jacque Archuleta Staehlin is an attorney retained by the District. ECF

No. 24 at 8, ¶ 28.

On August 23, 2019, Defendant sent a Board Update for the week of August 19–

23, 2019, labeled "Confidential." *Id.* at 8, ¶ 29. The update stated:

> I have received the Cease and Desist letter from our attorney.
> I have personalized two letters for the individuals who "run"
> the page. I plan to send the letters out to them on Tuesday
> afternoon. Please let me know if you have objections to me
> sending the letter before Tuesday. I have attached a copy of
> the letter to this update.

ECF No. 24-6 at 1.

On August 29, 2019, Defendant sent the cease-and-desist letters via certified mail

to the respective Plaintiffs, enclosing a copy of the government's trademark approval

notice. ECF No. 24 at 9, ¶ 25. The cease-and-desist letters, signed by Defendant, stated:

> The purpose of this letter is to inform you that the Los Lunas
> Schools reserves all rights to and is the owner of the
> trademarked term "Los Lunas Schools" that was trademarked
> on July 9, 2019 and is registered under U.S. Trademark
> Registration Number 5,798,193. Attached is a copy.
>
> It has been brought to our attention that you or others you
> communicate with made unauthorized use of the Los Lunas

7

School trademark for purposes of criticizing and providing false information about the District. Los Lunas School District Parents Discussion Facebook page and use in other social media of the term "Los Lunas Schools" is confusing and misleading to those individuals who are searching for information regarding the school district and its operations and is considered an infringement upon the District's intellectual property rights.

On behalf of the District, I therefore ask you to CEASE and DESIST from any and all unlawful acts and trademark infringement with regards to your actions, statements relating to the use of the term "Los Lunas Schools" or other aka names listed on the trademark.

Failure to comply with this notice will confirm your complicity and force the District to take further legal action including filing of a civil lawsuit seeking monetary damages, court and attorneys' fees, incurred as a direct result of your unlawful actions of trademark infringement.

The District will do all that is necessary to protect its rights regarding its registered trademark.

THEREFORE, you are on notice to immediately CEASE and DESIST from further acts of infringement within 10 calendar days of today's notice and return the signed written assurance below that you will refrain from any and all further acts of infringement **including removal of the unauthorized social media account on Facebook**.

ECF No. 24-8 at 1 (emphasis added).

The cease-and-desist letters each included a second page titled "CEASE AND DESIST ASSURANCE" for Plaintiffs to sign and date. ECF No. 24 at 9, ¶ 31. This page stated:

In accordance with all applicable state and federal laws including all Trademark Act provisions 15 USCA §§1114-1125, and the attached letter request I _____ do hereby agree to immediate CEASE and DESIST from any further infringement with regards to the use of the term "Los Lunas Schools" or any other aka name listed on the

8

> trademark. In turn the District will release me from any claims of infringement for my use of the term after the term was trademarked.
>
> However, should I act or behave in a manner that would breach this agreement the District would be entitled to filing fees, court costs, attorneys' fees in any action which may be filed in an effort to enforce this agreement in addition to any injunctive relief and monetary damages due the District may have been entitled to had this Assurance never been filed.

ECF No. 24-9 at 1.

That same day, August 29, 2019, Defendant sent a Board Update for the week of August 26–30, 2019, labeled "Confidential." ECF No. 24 at 8, ¶ 29. The update stated:

> The Cease and Desist letters to the "owners" and "operators" of the "Haters" page were sent out on Thursday. I expect that there will be quite an uproar from people that contribute to the page. Thank you for all of your support through this process.

ECF No. 24-7 at 1.

On August 31, 2019, upon receiving the cease-and-desist letters, Plaintiffs immediately changed the title of the Facebook page from "Los Lunas School District Parent Discussion Page" to "Parent Discussion Page of Local Public Schools." ECF No. 24 at 9, ¶ 33. Plaintiffs did so for about one month, but then changed the title back to "Los Lunas School District Parent Discussion Page" and have continuously maintained their page under this name. *Id.* at 9, ¶ 33.

On October 10, 2019, the District issued a media statement noting that Plaintiffs' page is one of the first pages that appears in a Facebook search for "Los Lunas Schools" and that the site is often mistaken for "a forum that is monitored and approved by district officials." *Id.* at 9–10, ¶ 34. The media statement further stated the page "causes issues with the orderly operations of individual schools and the district." *Id.* at 10, ¶ 34.

On October 25, 2019, an attorney representing the District wrote a letter to an attorney representing Plaintiffs in response to correspondence sent from Plaintiffs' attorney. *Id.* at 10, ¶ 35. The letter states, in relevant part:

> [T]he District is requesting that your clients remove the name "Los Lunas Schools" and its recognized variations from their Facebook page. The District is not requesting that they pull down the page in Facebook they simply cannot use the name Los Lunas Schools or its recognized variation in the title.
>
> The name "Los Lunas Schools" has clearly been trademarked and the District has exclusive rights to the use of that name **to identify any and all matters directly or indirectly related to the school district**. While I understand that your clients have questioned the District's rationale, it is the confusion which arises from having a Facebook site which speaks disparagingly about the District school staff and students with a legitimate school sponsored site. An example of the confusion is different information regarding "snow days" and misinformation regarding graduation dates. Both of which happened and caused individuals to receive the wrong information from your clients' Facebook page. Ms. Tachias and Ms. Derretta have been given notice to take the name off of the page which I understand was done but have since reverted to using the name again. Please advise your clients to remove the name ["]Los Lunas Schools" from their Facebook page immediately. Failure to comply will cause the District to seek and enforce its legal remedies available under the Trademark including damages.

ECF No. 24-10 at 1–2 (footnote omitted) (emphasis added).

As of January 21, 2021, the District and Defendant have issued cease-and-desist letters to enforce their trademark of "Los Lunas Schools" to only Plaintiffs Rowena Tachias and Monique Dereta. ECF No. 34 at 7, ¶ F. Further, as of January 21, 2021, the District has provided no public guidance for properly licensing or using the "Los Lunas Schools" mark. *Id.* at 7, ¶ G. The District has a "Policy on Intellectual Property," however,

this policy—which was approved in 1997 and last revised in 2008—does not address the use of any trademark owned by the District. *Id.* at 7, ¶ G.

## PROCEDURAL BACKGROUND

On February 2, 2021, Plaintiffs filed this action asserting a 42 U.S.C. § 1983 ("Section 1983") claim for retaliation in violation of the First Amendment to the United States Constitution. *See generally* ECF No. 1. Plaintiffs seek monetary, declaratory, and injunctive relief. *Id.* at 19–20. On June 30, 2021, Defendant, sued in her individual capacity, filed the underlying Motion seeking summary judgment on the First Amendment claim pursuant to Federal Rule of Civil Procedure ("Rule") 56 based on qualified immunity. *See generally* ECF No. 24 Plaintiffs filed their Response on August 30, 2021, and Defendant filed her Reply on November 30, 2021. *See generally* ECF Nos. 34, 43.

## LEGAL STANDARDS

### I.    Summary Judgment

Rule 56 allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant must put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim. *Id.* at 248.

11

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)) (internal quotation marks omitted).

It is not the court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Liberty Lobby, Inc.*, 477 U.S. at 249–50 (internal citations omitted).

## II.    Qualified Immunity

The Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, provides in relevant part that "[e]very person who, under color of any statute . . . of any State . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." Thus, Section 1983 creates a federal cause of action for damages to vindicate alleged violations of federal law

committed by individuals acting "under color of state law." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). The statute "creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995). "In defending against § 1983 claims . . . an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In other words, it protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). The court may address these two inquiries in any order. *Pearson*, 555 U.S. at 236. However, if the plaintiff fails to satisfy either prong, the court must grant qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). If the plaintiff succeeds, then—and only then—does the defendant bear the traditional burden of the movant for summary judgment. *Kapinski*, 964 F.3d at 905 (quoting *Koch*, 660 F.3d at 1238).

**DISCUSSION**

I.   **Defendant is not entitled to qualified immunity or judgment as a matter of law.**

Defendant moves for summary judgment on Plaintiffs' First Amendment retaliation claim based upon qualified immunity. Defendant maintains she is entitled to qualified immunity because her conduct did not violate a constitutional right, and the law was not clearly established at the time of the alleged constitutional. ECF No. 24 at 15. Plaintiffs dispute these arguments. ECF No. 34 at 1. As a preliminary matter, the Court concludes there is an absence of a genuine issue of material fact. Accordingly, the court analyzes each prong of the qualified immunity standard in turn.

   A.   **Plaintiffs have made a sufficient showing that Defendant committed a constitutional violation.**

      1.   **Applicable Law**

The First Amendment to the United States Constitution states that "Congress shall make no law . . . abridging the freedom of speech . . . ."[5] U.S. Const. amend. I. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Nieves v. Bartlett*, ⸺ U.S. ⸺,139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quoting *Lackey v. County of Bernalillo*, No. 97–2265, 1999 WL 2461, at *3

_____

[5] While the First Amendment only explicitly applies to the federal government, it has been applied to the states through the incorporation doctrine of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

14

(10th Cir. 1999)). A claim for First Amendment retaliation requires proof of the following elements: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Id.* (establishing *Worrell* framework) (quotation marks omitted).

### 2. Analysis

Plaintiffs argue Defendant retaliated against them for speech taking place on the Los Lunas School District Parent Discussion Page by trademarking "Los Lunas Schools" and subsequently threatening frivolous legal action against them unless they took down their page or changed the title. *See* ECF No. 34 at 12. The Court considers each element of the *Worrell* framework.

### a. Constitutionally Protected Speech

The Court concludes that a reasonable factfinder could find for Plaintiffs on the first element—that Plaintiffs were engaged in constitutionally protected activity in the hosting, content, and title of their page. The Supreme Court in *Terminiello v. City of Chicago* emphasized the importance of free speech as protected by the First Amendment:

> The vitality of civil and political institutions in our society depends on free discussion. As Chief Justice Hughes wrote . . . it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

> Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

337 U.S. 1, 4 (1949) (internal citations omitted). Significantly, "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Indeed, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures . . . ." *Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944). As such, the Supreme Court has expressed "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). This commitment includes "not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner*, 322 U.S. at 673–74.

16

Although safeguarding criticisms of the government is a core purpose of the First Amendment, almost all speech is protected other than "in a few limited areas."[6] *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992)). The Supreme Court has declined efforts to create new categories of disfavored speech. *See, e.g.*, *Alvarez*, 567 U.S at 722 (declining to find that false statements are a new category of unprotected speech); *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 792–93 (2011) (declining to find that violent video games are a new category of unprotected speech); *Stevens*, 559 U.S. at 472 (declining to find that depictions of animal cruelty are a new category of unprotected speech).

Notably, as society progresses, the means by which we communicate also continue to develop. Historically, the quintessential forum for the exercise of First Amendment rights was thought to be a street or a park. *Packingham v. North Carolina*, –—— U.S. ——, 137 S. Ct. 1730, 1735 (2017). Today, however, the most important places for the exchange of views are "cyberspace—the vast democratic forums of the Internet in general, and social media in particular." *Id.* (internal citation and quotation marks omitted). One of the most popular social media websites, Facebook, allows "users [to] debate religion and politics with their friends and neighbors or share vacation photos." *Id.* Indeed, social media websites "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 1737. They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it

---

[6] These historic and traditional "limited areas" include incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent. *United States v. Alvarez*, 567 U.S. 709, 717 (2012).

could from any soapbox." *Id.* (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997)). Thus, social media platforms of all varieties—including Facebook, Instagram, Snapchat, TikTok, and new platforms to come—are now crucial parts of our town square.[7]

Based on First Amendment jurisprudence, the hosting, content, and title of Plaintiffs' Facebook page are protected activities under the First Amendment. The undisputed evidence establishes that Defendant originally threatened to bring legal action against Plaintiffs unless they removed the page entirely, and later demanded that Plaintiffs only change the title. ECF No. 24-8 at 1; ECF No. 24-10 at 1. As a preliminary matter, hosting an internet forum for speech is protected by the First Amendment. *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("[P]ublishing Netbuffs.com is undoubtedly activity protected by the First Amendment.").

Furthermore, the content of Plaintiffs' page constituted protected speech under the First Amendment. The content of the page included discussions about issues relating to the District. Topics of conversation ranged from innocuous to serious, encompassing posts about parents discussing their own children, snow days and school closures, the school calendar, criticisms and concerns regarding District employees, and allegations that a District principal threatened a student. As to the criticisms, concerns, and non-defamatory allegations relating to government employees, such speech is core protected activity under the First Amendment.

---

[7] Although this case concerns Facebook, there is no legitimate basis for distinguishing between the various social media websites for purposes of establishing a First Amendment violation.

Regarding discussion on the page generally, parents and guardians have the utmost right to be concerned about matters pertaining to their children's education and upbringing. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (recognizing liberty interest of parents in the care, custody, and control of their children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (recognizing liberty interest of parents and guardians "to direct the upbringing and education of children under their control"); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) (recognizing liberty interest of parents to "establish a home and bring up children" and "to control the education" of their children). In fact, there has been much recent national public debate surrounding school curricula, policies, and practices. Sarah Mervosh & Giulia Heyward, *The School Culture Wars: 'You Have Brought Division to Us'*, N.Y. Times (Nov. 8, 2021), https://www.nytimes.com/2021/08/18/us/schools-covid-critical-race-theory-masks-gender.html. Although some of the information on the page may have been inaccurate or confusing, Defendant makes no allegations that any of the page's content falls into a traditional category of unprotected speech.

Regarding the title of Plaintiffs' page—as opposed to the content—Defendant implies the title does not constitute speech as understood by the First Amendment. *See* ECF No. 24 at 17 ("No one is 'prohibiting' speech on Plaintiffs' Facebook site—what was being sought by Defendant Sanders on behalf of the School District was to have the name 'Los Lunas Schools' and/or its recognized variants removed from the title of Plaintiffs' Facebook site."); ECF No. 43 at 8–9 ("Defendant Sanders never sought to censor Plaintiffs' free speech, but instead only sought non-use of the school district's name by Plaintiffs in the title of their Facebook site . . . ."). Such a distinction is erroneous. A title

of a social media page—like that of a book or a movie—is speech subject to First Amendment protections. *See, e.g.*, *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) (noting that title of book is parody constituting protected speech); *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) (holding that title of movie contained "expressive element" implicating First Amendment). Again, Defendant makes no allegations that the title of the page falls into a traditional category of unprotected speech.

Rather, Defendant argues the title of Plaintiffs' page—the "Los Lunas School District Parent Discussion Page"—is not protected speech because it constitutes trademark infringement of the District's trademark of "Los Lunas Schools." ECF No. 24 at 18–19. However, Defendant has neither outlined any argument nor provided evidence to the Court that the title of Plaintiffs' page constituted trademark infringement.

The Lanham Act prohibits the use of a trademark—and therefore implicitly restricts speech—that is likely to cause confusion about the source of a product or service. *See* 15 U.S.C. §§ 1114, 1125(a). "To invoke the protections of the Lanham Act, a [trademark holder] must show that the alleged infringer used the [trademark holder's] mark 'in connection with any goods or services.'" *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1051–52 (10th Cir. 2008) (citing 15 U.S.C. § 1125(a)). This is commonly described as the "commercial use requirement." *Id.* at 1052. The Tenth Circuit has made clear that "[t]he Lanham Act is intended to protect the ability of consumers to distinguish among competing producers, not to prevent all unauthorized uses." *Id.* (internal citation and quotation marks omitted). Thus, the Tenth Circuit has "interpreted this element as protecting from liability all noncommercial uses of marks."

20

*Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 322 (4th Cir. 2015) (citing *Utah Lighthouse Ministry*, 527 F.3d at 1052–54). Indeed, "trademark rights cannot be used to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Utah Lighthouse Ministry*, 527 F.3d at 1052–53 (quoting *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 675 (9th Cir. 2005)) (internal quotation mark omitted). The alleged infringer must use the mark in connection with a competing producer's goods or services, as the Lanham Act's purpose is "to protect the ability of consumers to distinguish among competing producers." *Id.* at 1053 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992)). As such, "[t]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id.* at 1054 (citing *Lang v. Ret. Living Publ'g Co.*, Inc., 949 F.2d 576, 582–83 (2d Cir. 1991) (internal citation and quotation marks omitted)). Like in *Utah Lighthouse*, Plaintiffs did not use the term "Los Lunas School" in connection with the sale of goods or services, but instead in connection with the expression of their views about the District. *Id.* at 1053. Thus, contrary to Defendant's contentions, the title of Plaintiffs' page did not constitute trademark infringement. As such, Plaintiffs engaged in their First Amendment right to choose the title of their Facebook page.

### b.  Chilling Effect on Speech

As to the second element, a factfinder could conclude that Defendant caused Plaintiffs an injury that would chill a person of ordinary firmness from continuing to engage in the constitutional activity at issue. This standard is an objective one. *Plati*, 258 F.3d at 1177 ("The focus, of course, is upon whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled.").

21

Here, Defendant obtained a trademark of "Los Lunas Schools" and, thereafter, issued cease-and-desist letters to Plaintiffs threatening to take "legal action [against them] including filing of a civil lawsuit seeking monetary damages, court and attorneys' fees," unless Plaintiffs "refrain[ed] from any and all further acts of infringement including removal of the unauthorized social media account on Facebook." ECF No. 24-8 at 1. Plaintiffs were provided "10 calendar days" to return a signed assurance that they would cease-and-desist from any alleged trademark infringement concerning the use of the term "Los Lunas Schools." *Id.* More than a month after issuing the cease-and-desist letters, it was clarified that Plaintiffs "cannot use the name Los Lunas Schools or its recognized variation in the title" and that "[f]ailure to comply will cause the District to seek and enforce its legal remedies available under the Trademark including damages." ECF No. 24-10 at 1–2. The Court determines these threats of litigation would cause a person of ordinary firmness to cease participation in their constitutionally protected right to speak freely on social media. *See, e.g., Dear v. Nair*, No. 21-2124, 2022 WL 2165927, at *5 (10th Cir. June 16, 2022) ("Being exposed to claims for monetary damages would chill a person of ordinary firmness from exercising their right to petition the government."). Indeed, the record reflects that Plaintiffs immediately changed the title of their page to "Parent Discussion Page of Local Public Schools" upon receiving the cease-and-desist letters from Defendant. ECF No. 24 at 9, ¶ 33.

### c. Retaliatory Motive

As to the third element—whether Defendant's actions were substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct—there is evidence in the record from which a reasonable factfinder could find retaliatory motive.

The record contains numerous admissions by Defendant, outlined below, that she sought to have the content and title of Plaintiffs' page removed due to the speech taking place on the page. As stated earlier, the hosting, content, and title of the page are deemed activities protected by the First Amendment. This includes the name of the title in its entirety—as the title did not constitute trademark infringement due to the page's noncommercial nature—and posts that contained inaccurate or confusing information or voiced criticisms, concerns, and non-defamatory allegations relating to government employees.

First, Defendant makes several admissions regarding her concerns about the page, including that she thought it was confusing, misleading, and provided incorrect information about the District. ECF No. 24-1 at 2–3, ¶ 8–11. Defendant further admits she was worried about "criticisms or concerns regarding" District employees made on the page. *Id.* at 4, ¶ 13. She also states she had apprehensions about posts identifying minor children—including posts of "parents identifying their own children." *Id.* at 3, ¶ 12.

Additionally, the record provides evidence that Defendant acted to have the content and title of the page removed in response to the October 12, 2018 post alleging a District principal threatened a student. Defendant states she began "to actively work towards obtaining a trademark" in response to the October 12, 2018 post. *Id.* at 5, ¶ 21. Further, on October 15, 2018, Defendant sent a text message to the Board members stating that she was "trying to figure out how to Trademark the Los Lunas Schools name" and "wanted [the term 'Los Lunas Schools'] removed from their Facebook page." *See* ECF No. 24-2 at 1. The record also reflects Defendant's animus towards the page during this period, as Defendant referred to the page as the "haters page" on at least two

occasions in Board Updates. ECF No. 24-3 at 1; ECF No. 24-7 at 1. Most tellingly, the

cease-and-desist letters sent to Plaintiffs by Defendant stated, in part:

> It has been brought to our attention that you or others you
> communicate with made unauthorized use of the Los Lunas
> School trademark **for purposes of criticizing and providing
> false information about the District**. Los Lunas School
> District Parents Discussion Facebook page and use in other
> social media of the term "Los Lunas Schools" is **confusing
> and misleading to those individuals who are searching
> for information regarding the school district and its
> operations** and is considered an infringement upon the
> District's intellectual property rights.

ECF No. 24-8 at 1 (emphasis added). Defendant's letters prove that she sought to take

action against Plaintiffs because of protected speech occurring as part of the page.

Moreover, the rationale for the cease-and-desist letters was described to Plaintiffs as

stemming from "the confusion which arises from having a Facebook site which speaks

disparagingly about the District school staff and students . . . ." ECF No. 24-10 at 1.

Lastly, Defendant, by her own admission, specifies she "was motivated as a public

official to obtain a trademark for the School District based upon her legitimate discretion

as a public school superintendent who was reasonably concerned about the mis-

information and rumormongering on Plaintiffs' Facebook site being attributed to the

School District . . . ." ECF No. 24 at 21.

In sum, viewing the facts in the light most favorable to Plaintiffs, there is ample

evidence that Defendant was substantially motivated to seek legal action against Plaintiffs

in response to protected speech occurring on the page, including (1) speech that was

confusing, misleading, and providing incorrect information about the District, (2) criticisms

or concerns regarding District employees, (3) posts identifying minor children, and (4) allegations that a District principal threatened a student.

In light of the above, Plaintiffs have shown the violation of a constitutional right and thus met their burden for defeating the first prong of the qualified immunity analysis.

### B. The law was clearly established at the time of the alleged constitutional violation.

#### 1. Applicable Law

A right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). A plaintiff can demonstrate that a right is clearly established in three ways. First, a "materially similar" published case from the Supreme Court or Tenth Circuit[8] may give an official fair notice that their specific conduct would violate a constitutional right. *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). Second, the plaintiff can show the existence of a broader, clearly established principle that should control the novel facts in this situation. *A.M. v. Holmes*, 830 F.3d 1123, 1135–36 (10th Cir. 2016). In other words, even if there is no "case directly on point," a body of relevant case law may provide fair warning of unlawful conduct. *Mullenix*, 577 U.S. at 12; (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).

---

[8] The Court is concerned about this requirement as it affords greater civil rights protections to individuals harmed in more populous circuits, like those that encompass the West and East Coasts. Compared to the other Federal Circuits, the Tenth Circuit has one of the smallest populations and one of the lowest civil caseloads. *See Federal Judicial Caseload Statistics 2022 Tables*, U.S. Courts (Mar. 31, 2022), https://www.uscourts.gov/federal-judicial-caseload-statistics-2022-tables. Because there are fewer published opinions regarding Section 1983 in the Tenth Circuit comparatively, individuals in more rural circuits—such as those residing within the Tenth Circuit—have fewer established civil rights than those in more populated circuits.

Finally, there can be the rare case where the conduct in question has not previously been held unlawful, but an official may still have notice that their conduct violates a constitutional right with obvious clarity. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

### 2. Analysis

The Court concludes the law was clearly established in 2018–2019[9] that threatening to file a frivolous civil lawsuit in retaliation for an individual's exercise of their First Amendment right to free speech—including criticisms and concerns regarding government employees—is unconstitutional under the First Amendment.

As an initial matter, "the facts alleged here present an especially weak basis for invoking qualified immunity." *Villarreal v. City of Laredo*, 44 F.4th 363, 371–72 (5th Cir. 2022). "When it comes to the First Amendment, . . . we are concerned about government chilling the citizen—not the other way around." *Id.* at 372 (quoting *Horvath v. City of Leander*, 946 F.3d 787, 802 (5th Cir. 2020)). This is not a case concerning a "split-second decision" by an official, but rather a "premeditated plan" to chill First Amendment speech that took place over several months. *Id.* at 371. *See also Rivas-Villegas v. Cortesluna*, –– U.S. –––, 142 S. Ct. 4, 8 (2021) (per curiam) ("[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."); *Hoggard v. Rhodes*, –––– U.S. –––, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.) ("But why should university officers, who

---

[9] Defendant concedes the relevant timeframe for the clearly established inquiry is 2018–2019. *See* ECF No. 24 at 16 ("Defendant Sanders is entitled to qualified immunity because the law was not clearly established in 2018–2019 regarding Plaintiffs' claim of an alleged constitutional violation based upon the facts of this case.").

have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?").

Nonetheless, the Tenth Circuit in *Beedle v. Wilson* put Defendant on notice that her specific conduct violated the First Amendment. 422 F.3d 1059 (10th Cir. 2005). In *Beedle*, one of the plaintiffs, Peggy Lee Korn, was allegedly a victim of several incidents of sexual battery committed by Trisha Hasty, a nurse's aide, while hospitalized at Jackson County Memorial Hospital (the "Hospital"). *Id.* at 1063. As a result, Ms. Korn and her husband, Larry E. Beedle, wrote two letters inquiring whether anyone else had experienced anything similar while at the Hospital and mailed the letters to numerous local residents. *Id.* Based on the letters, the Hospital sued Mr. Beedle in Oklahoma state court for libel. *Id.* Mr. Beedle filed suit in federal court arguing that the Hospital violated his First Amendment rights by initiating the malicious and wrongful state-court libel lawsuit against him, maintaining that the libel suit was designed and intended to punish him for his speech and to chill future speech. *Id.* at 1064. He further argued that the Hospital knew or should have known that, as a government entity, it was precluded from filing a malicious libel claim against a private citizen. *Id.*

The Tenth Circuit in *Beedle* first discussed two cases that involved criminal prosecutions, *Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996), and *Gehl Group v. Koby*, 63 F.3d 1528, 1534 (10th Cir. 1995), and observed that "[t]hese cases make clear that a governmental lawsuit brought with the intent to retaliate against a citizen for the exercise of his First Amendment rights is itself a violation of the First Amendment and provides grounds for a § 1983 suit." *Beedle*, 422 F.3d at 1066. The Tenth Circuit then

agreed with Mr. Beedle that government entities—such as the Hospital—are barred from bringing libel actions against private citizens. *See id.* at 1066–67. Finally, concerning the specific circumstances in *Beedle* itself, the Tenth Circuit held that a frivolous civil lawsuit initiated by a government entity—like that filed by the Hospital—in retaliation for an individual's speech violates that individual's First Amendment rights. *Id.* at 1067 ("We conclude, therefore, that Mr. Beedle has sufficiently pled, for the purposes of surviving a 12(b)(6) motion, that the Hospital, as a governmental entity, violated his First Amendment rights by filing the malicious libel action against him.").

Although the facts of every case are necessarily different,[10] the facts at issue here are "materially similar" to those in *Beedle*.[11] First, like the letters distributed in *Beedle*, Plaintiffs' page included criticisms and concerns regarding government employees relating to issues of public concern for community comment. Similarly, Defendant was substantially motivated to threaten litigation against Plaintiffs in response to this protected speech. Last, like the lawsuit filed by the Hospital, Defendant's threatened civil lawsuit fails to set forth a legally viable claim against Plaintiffs. Although *Beedle* involved a filed

---

[10] "Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day [] work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that [] officers are endeavoring to parse opinions." *Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) (Browning, J.) (internal citation omitted).

[11] Additionally, the facts at issue here are distinguishable from those in *Shero v. City of Grove*, whereby the Tenth Circuit held that a government suit seeking a declaratory judgment does not give rise to a First Amendment retaliation claim. 510 F.3d 1196, 1204 (10th Cir. 2007). Here, Defendant threatened to seek monetary damages, court fees, and attorneys' fees—not declaratory relief.

civil action as opposed to threats to file a civil action, this difference is immaterial.[12] A threatened lawsuit of this nature is arguably more distressing than a filed lawsuit, as the individual threatened is typically unrepresented, has not been apprised with particularity of the frivolous nature of the allegations against them, and cannot yet countersue for malicious prosecution. Further, Defendant's threatened lawsuit has not been filed, in part, because Defendant has represented she would not seek enforcement of the trademark against Plaintiffs while this case is pending. ECF No. 24 at 17 n.1.

Furthermore, broader clearly established Constitutional principles control the facts in this situation. "It has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005). "[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, *threatened prosecution*, bad faith investigation, and *legal harassment*, constitutes an infringement of that freedom." *Worrell*, 219 F.3d at 1212 (quoting *Lackey*, 1999 WL 2461 at *3) (emphasis added). Additionally, other circuits have similarly held that a civil action filed in retaliation for an individual's exercise of their First Amendment rights can support Section 1983 liability. *See, e.g., DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1300–09 (11th Cir. 2019); *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Wash. Indus. Dev. Agency*, 77 F.3d 26, 27–29 (2d Cir. 1996); *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986). This body of relevant case law put Defendant on notice that the conduct at issue was unconstitutional.

---

[12] It is fair to contend that if the government cannot file a retaliatory and malicious civil lawsuit, by that same logic, it cannot *threaten* to file such a lawsuit.

Lastly, this is also an "obvious case" of a First Amendment violation. There is no established standard to determine obviousness. *See Wilson v. City of Lafayette*, 510 Fed. Appx. 775, 791 (10th Cir. 2013) (Matheson, J., concurring.) ("The case law does not define egregiousness."). However, any reasonable government official understands that they cannot seek to censor or suppress speech about the government they may dislike or disagree with merely because of such dislike or disagreement. *New York Times Co.*, 376 U.S. at 269–70. This is a bedrock principle of our democracy that traces back to the founding of this nation. *See Citizens United v. FEC*, 558 U.S. 310, 353 (2010) ("The First Amendment was certainly not understood to condone the suppression of political speech in society's most salient media. It was understood as a response to the repression of speech and the press that had existed in England and the heavy taxes on the press that were imposed in the Colonies."). This is "a general constitutional rule already identified in the decisional law" that applies with "obvious clarity to the specific conduct in question." *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Because Defendant's behavior is "obviously egregious," the "unlawfulness of [Defendant's] conduct is sufficiently clear even [if] existing precedent does not address similar circumstances." *Truman v. Orem City*, 1 F. 4th 1227, 1240 (10th Cir. 2021) (internal citations omitted). To hold otherwise would sanction a scenario where an elected official trademarks their own name and threatens to file a frivolous suit against their political opponents for making disparaging social media posts using the official's trademarked name. Principles of a free society designate counter-speech—not censorship—as the appropriate remedy for objectionable speech. *See Alvarez*, 567 U.S. at 727–29 ("The remedy for speech that is false is speech that is true. This is the ordinary

course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth. The theory of our Constitution is that the best test of truth is the power of the thought to get itself accepted in the competition of the market. The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse.")

Consequently, the unlawfulness of Defendant's actions was apparent in light of pre-existing law, and Plaintiffs have thus met their burden for defeating the second prong of the qualified immunity analysis.

### C.  Defendant is not entitled to judgment as a matter of law.

As stated previously, if the plaintiff defeats qualified immunity, the defendant bears the traditional burden of the movant for summary judgment. *Kapinski*, 964 F.3d at 905 (quoting *Koch*, 660 F.3d at 1238). As Plaintiffs have met their burden under the qualified immunity inquiry, Defendant must now establish that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court determines that a reasonable jury could find for Plaintiffs on all three elements of the *Worrell* test to establish a violation of the First Amendment. As such, Defendant is not entitled to judgment as a matter of law.

### II.   Plaintiffs' request pursuant to Rule 56(d) for discovery is moot.

Lastly, Plaintiffs request limited discovery pursuant to Rule 56(d) to adequately respond to the Motion and the facts asserted in Defendant's affidavit. ECF No. 34 at 27.

Rule 56(d) provides that if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." At this juncture, the Court determines Plaintiffs' request is moot.

**CONCLUSION**

For the foregoing reasons, Defendant Dana Sanders' Motion for Summary Judgment on Basis of Qualified Immunity, ECF No. 24, is hereby **DENIED**.

**IT IS SO ORDERED.**

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE